IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       v.                                                         20-CR-80A

COURTLAND RENFORD,

                Defendant.

## REPLY TO DEFENDANT'S RESPONSE TO THE GOVERNMENT'S MOTION FOR REVIEW OF THE MAGISTRATE COURT'S DETERMINATION ON DETENTION

The United States of America by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and Jeremiah E. Lenihan, Assistant United States Attorney, hereby files a Reply to the Defendant's Response to the Government's Motion for an Order Revoking the Decision and Order entered by the Honorable Jeremiah J. McCarthy, United States Magistrate Court, releasing the defendant. (Dkt. 15).

The government predicated its arguments upon the four factors set forth in Title 18, United States Code, Section 3142(g) and the presumption under Title 18, United States Code, Section 3142(e)(3)(C). In the defendant's response, he argues that he poses neither a flight risk nor danger to the community. In arguing that he should be released, he asserts the following: 1) unknown agitators provoked him, and therefore, he did not form the proper mens rea; 2) that the defendant's actions could not have caused widespread harm because he

threw the fire into an "empty building;" 3) that the defendant has a plan to deal with his mental health issues; and 4) the defendant is a "young man with a short criminal history of petty crimes..." (Dkt. 24 p. 20).  The defendant's arguments do little to undermine the strength of the 18 U.S.C. 3142(g) factors that weigh in favor of detention.  Nor do the defendant's arguments rebut the presumption of detention.  As such, these arguments fall short of justifying the defendant's release in accordance with the Bail Reform Act.

As to his first point, the defendant has offered no evidence to prove that outside agitators provoked the defendant.  It may be true that elsewhere outside agitators engaged in violent acts during peaceful protests.  The facts here, however, do not support such an assertion.  Nor does the evidence suggest any difficulty in proving the defendant's <u>mens rea</u>, i.e. that he maliciously or attempted to damage and destroy Buffalo City Hall.  In fact, the defendant's intent has never been in question.  He is captured on news camera footage deliberately setting fire to Buffalo City Hall.  Additionally, he provided post-<u>Miranda</u> admissions on multiple occasions admitting such.

While the defendant's intent has been clear from the moment this fire occurred, what remained less clear was the defendant's motive.  In his response, the defendant suggests that he happened to be surrounded by "anarchist groups, trained to target and influence otherwise peaceful protestors…" (Dkt. 24 p. 12).  The response suggests that the defendant was the "perfect target" for these anarchist groups.  Again, zero evidence exists to support this assertion.  Moreover, since the government's initial filing, the government has gained a greater understanding into the defendant's motive: to cause destruction and mayhem in Buffalo, NY on May 30, 2020.

The government obtained video surveillance video from 7-11 on the corner of Elmwood and Summer Avenues, Buffalo, NY. At approximately 10:10 p.m., a large group of individuals shattered front door of the 7-11 and began looting. The defendant was on the front lines of this effort to loot and cause damage to this 7-11.

As items were being thrown through the windows, an individual with his shirt off believed to be the defendant is seen captured in front of the store:



As the glass shatters on the front door, the defendant is one of the first individuals seen entering the 7-11:



He is then captured on video jumping the counter:



Approximately one (1) minute later, the defendant is captured on video with no shirt, wearing black pants, with a bun on the top of his head, wearing the same distinctive Chanel face mask as captured on video in Niagara Square, with items in his hand:



He goes back into the store and jumps the front counter:



He then leaves the store, carrying an item in his hand:



After the defendant commits this burglary, he proceeds towards Niagara Square. As previously argued, he remained in Niagara Square after a curfew had been initiated and engaged in the charged offense.

Further, upon searching the defendant's phone pursuant to a federal search warrant, on the morning of June 1, 2020, a short time before the police arrived at his residence, the defendant sent text messages discussing how he needed to change his appearance by cutting his hair and getting a chest tattoo.

Not only does the looting incident and the defendant's intent to change his appearance crystalize the defendant's motive – to engage in destruction in this community and get away with it – but it also demonstrates that the defendant's word cannot be trusted. In his videotaped post-<u>Miranda</u> interview, the defendant was asked if he went to a 7-11 on the night of the incident. The defendant told Agents that he went to the 7-11 on Auburn Avenue, watched the manager lock the door and "saw a guy rip the door and break the glass." He said he was in 7-11 for a "split second" and then walked out. The video evidence squarely contradicts the defendant's claim.

The defendant's lack of credibility dovetails into the fact that he cannot be believed that he will be able to execute a "plan" to address his mental health and substance abuse issues. (Dkt. 24 p. 20). Not only has the defendant failed to present his "plan," and therefore not met his burden under Title 18, United States Code, Section 3142(e)(3)(A), he cannot be believed. The Court should view any assertions made by the defendant with deep skepticism.

Further, the defendant minimizes his criminal history by categorizing his history as that of "petty thefts." As argued previously, the defendant has engaged in theft-related offenses that has led to periods of incarceration. Moreover, he has a history of violence with weapons. These criminal offenses have occurred in the past two (2) years when the defendant stated that he need mental health and addiction services. He, by his own admission, "began to ween himself off his prescripts and self-medicate[d] as opposed to reporting to health care physicians his issues with medications." (Dkt. 24 p. 19). There is no reason to believe that he will now abide by the terms and conditions of release, including mental health and/or alcohol/drug treatment and services.

Finally, as to the defendant's assertion that the Court should not place much weight on the nature and circumstances of the offense charged because he set fire to an "empty building," this Court should also reject this argument. (Dkt. 24 p. 19). That is because common sense and Congress, for that matter, dictates otherwise. Congress has identified this offense an act of terrorism. See 18 U.S.C. § 2332b(g)(5)(B). And, since the government's initial filing, the Second Circuit described the throwing of a Molotov cocktail into an empty police vehicle as "serious," and that the actions of the defendants "could well have resulted in significantly more harm than it did." United States v. Mattis, 2020 U.S. App. LEXIS

20427, *15-16 (2d Cir. 2020). Without question, the nature and circumstances of this offense are serious and could have caused grave harm to the public, including protestors, police and fire personnel.

As the Court is well aware, in determining bail, courts are to make "individualized assessments based on specific factors set forth in 18 U.S.C. Section 3142(g)." United States v. Nunez, 2020 U.S. Dist. LEXIS 68934, *6 (S.D.N.Y., April 20, 2020). An individualized assessment of the factors here warrant the defendant's detention. The defense in its papers seeks to contrast the facts here to the cases the government set forth in its initial filing. By citing those cases, such as United States v. Hill, United States v. Malizio, and United States v. Ellison, the government is not trying to make factual comparisons. The defendant is not charged with narcotics-related offenses like the charges in those cases. Rather, the purpose was to discuss the guiding principles taking into consideration in those cases. The facts may differ, but the principles remain true. For example, electronic monitoring is, at times, such as here, insufficient here to adequately protect society and prevent flight. That principle held true in United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993), which discussed how electronic monitoring can be "circumvented" and "rendered inoperative."

Similarly, allegations of committing arson during social unrest has led Courts in United States v. O'Donnell and United States v. Densmore to detain the defendants pretrial. Those Courts discussed the heavy weight to be given to the first two (2) factors under 18 U.S.C. § 3142(g). Similar to here, those Courts, upon weighing the factors in the Bail Reform Act detained the defendants. Individualized assessments rendered detention in those cases appropriate. Just like an individualized assessment warranted the release of the defendants in Mattis, supra, 2020 U.S. App. LEXIS 20427. There, although the Second Circuit ultimately upheld the District Court's order of release, the Court went to great lengths to state that appellate review "constrained" their review and that the Court "would not necessarily have reached the same conclusion…" Id. at *16, 28. Here, the review is much different, as this Court has the ability to undertake a de novo review. Moreover, the factors in Mattis, particularly the history and characteristics of the offense, weighed heavily in favor of release, as those defendants were professional lawyers with no criminal history, had strong reputations, and could post $250,000 bonds. That stands in stark contrast to the defendant, an individual who has a criminal history 8 arrests, lacks employment, frequently consumes alcohol, has not treated his mental health issues, lied to investigators, looted, discussed changing his appearance, and offered a miniscule bail amount. Moreover, setting fire to a police vehicle, although extremely serious, pales in comparison to setting fire to an iconic building in downtown Buffalo in close proximity to a group of people including protestors and first responders. The facts here are different. An individualized assessment under the Bail Reform Act warrants detention.

When taking the totality of the circumstances into account as set forth in Title 18, United States Code, Section 3142(g), as well as the presumption of detention in accordance to Title 18 3142(e)(3)(C), there is no condition or combination of conditions that can reasonably assure the defendant's return to court or the safety of the community.  The Magistrate Court's conditions of home incarceration with electronic monitoring, along with cash and signature bonds, are insufficient to assure the defendant's appearance or sufficiently protect society.  For these reasons, the government continues to request that this Court revoke the Magistrate Court's decision and order the defendant's continued detention pending trial.

DATED:  Buffalo, New York, July 9, 2020.

JAMES P. KENNEDY, JR.
United States Attorney

BY:   S/ JEREMIAH E. LENIHAN
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, NY  14202
716/843-5805
Jeremiah.Lenihan@usdoj.gov