UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

**DECISION AND ORDER**
20-CR-80-A

COURTLAND RENFORD,

          Defendant.

This case is before the Court on the Government's motion pursuant to 18 U.S.C.

§ 3145(a)(1) to revoke a June 22, 2020 order of Magistrate Judge Jeremiah J.

McCarthy authorizing the pretrial release of Defendant Courtland Renford.  Defendant

Renford is charged in an Indictment, dated June 4, 2020, with one count of arson of a

building in interstate commerce in violation of 18 U.S.C. § 844(i).

The Magistrate Judge's June 22, 2020 order authorized the pretrial release of

Defendant Renford to home incarceration with electronic monitoring, subject to the

posting of bonds in the amount of $20,000 each by Mr. Courtland Renford, Sr.

(Defendant's father), and Ms. Shamika Jones (Defendant's sister's mother) to be

secured by cash in the amount of $5,000 and $1,000, respectively.  The Government

argues that the conditions of release will not reasonably assure Defendant's

appearance as required or reasonably ensure the safety of the community pending the

trial.

In summary, the Court finds below that the evidence that Defendant Renford

committed the arson with which he is charged is substantial.  He faces a statutory

1

mandatory-minimum term of 5 years of imprisonment if he is convicted of that offense. The incentive for Defendant to flee before trial is therefore real.

Although Defendant Renford is only 20 years of age, he has accumulated a criminal record that will put him in Criminal History Category IV under United States Sentencing Guidelines if he is convicted as charged. He has been the subject of multiple bench warrants while under court supervision. He has committed additional crimes while under court supervision.

Moreover, due to the serious nature of the arson offense with which Defendant Renford has been charged, he is subject to a rebuttable presumption that no condition or combination of conditions of release will reasonably assure his appearance as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(C). Under these circumstances, and as further explained below, upon *de novo* review of the June 22, 2020 pretrial release order, the Court revokes that order and orders Defendant detained until trial.

## BACKGROUND

The Indictment alleges that on or about May 30, 2020, Defendant Renford set fire to Buffalo City Hall ("City Hall") (Dkt. No. 5). The facts set forth here are based upon Government proffers and submissions of the parties. The fire was set by tossing a plastic laundry basket containing flaming paper through a broken window on the first floor of City Hall after a local protest demonstration was conducted – despite the COVID-19 pandemic – in concert with nationwide protests precipitated by the death of George Floyd.

2

The Government proceeded by proffer at the detention hearing.  In short, (1) local news outlets videotaped the Defendant in the act of setting fire to City Hall; (2) after the fire and extensive publicity, Defendant expressed his intent to alter his appearance to evade law enforcement in a text message conversation; (3) Defendant hid from police when they arrived at his residence to arrest him; (4) a distinctive cloth mask that covered the mouth and nose of the perpetrator of the arson, or an identical one, was recovered at the time of his arrest; and (5) Defendant admitted repeatedly, and was recorded on videotape admitting, that he set fire to City Hall.

The alleged May 30, 2020 arson occurred at approximately 11:25 p.m., after the conclusion of a largely peaceful protest demonstration in Niagara Square in Buffalo.[1] City Hall is located on Niagara Square.

Livestream news video footage and corresponding still images show a distinctive-appearing individual wearing a designer-label mask over his nose and mouth. The person is thin, shirtless, and has a large "man-bun."  The mask is black with large overlapping red and gold C's, and the name "CHANEL" spans the bottom of the mask underneath the C's, indicative of the Chanel® brand[2] (the "distinctive" face mask). Other persons are seen wearing face masks, including some with black head and face wrappings.  No one else is seen on video wearing a mask like the distinctive Chanel mask.

---

[1] A Local Emergency Order issued by Erie County Executive Mark Poloncarz imposed a curfew from 10:30 p.m. on May 30, 2020 until 7:00 a.m. on May 31, 2020 (Dkt. No. 18-2).

[2] Chanel is a fashion company that sells luxury fashion merchandise worldwide.

The individual in the Chanel mask is seen on video tossing a green laundry basket with flames in it through a broken window into City Hall.  The small fire that ensued inside the building was extinguished by Buffalo Fire Department ("BFD") personnel.  A Fire Marshal has preliminarily estimated that the arson caused $10,000 in damage.[3]

As a result of extensive broadcasting of video of the alleged arsonist setting fire to City Hall, the Buffalo Police Department ("BPD") received a tip from a law enforcement officer who had seen the video.  The officer, who was familiar with the Defendant, identified the Defendant as the person seen in the video and provided Defendant's address to the BPD.

Sometime before 10:00 a.m. on June 1, 2020, law enforcement and BFD personnel arrived at Defendant's residence on Auburn Avenue.  They found Defendant hiding behind clothes in the upper apartment, where Defendant resided with his girlfriend and girlfriend's mother, and arrested him.  The Defendant was given *Miranda* warnings and made admissions that he was the person who set City Hall on fire that were recorded by police officers' body cameras.

BPD and BFD received written consent to search the upper and lower apartments.  In the lower apartment, which Defendant had access to (his girlfriend's sister resides there), they recovered a Chanel face mask.

Officers seized Defendant Renford's phone and later recovered text messages from the hours before police arrived at the Defendant's residence and arrested him.  Messages written by Defendant express his intention to evade law enforcement.  After

---

[3] Defendant contests the monetary amount of damage.  Photographs of the damage inside City Hall are included in Defendant's opposition papers (*see* Dkt. No. 24, pp. 3-4).

Defendant's texting companion indicated that everyone was saying he was not from Buffalo, Defendant responded, "Good".  His companion further told Defendant he had to get out of Buffalo, and that he could not be outside.  Defendant responded, "Ik" (possibly "I know").  His companion then mentioned going to buy him "dye" that day, to which Defendant responded that he intended to cut his hair. [4]

Defendant's texting companion suggested that Defendant should get tattoos because a particular image showed him without any.  Defendant responded, "I just need a chest tat".  His companion suggested Defendant also needed a tattoo on his arm.  Defendant stated, "I got one one my arm".  His companion stated that his arm tattoo did not show on the news and that the news was saying he did not have any tattoos.  Defendant replied, "Good".  His companion later informed Defendant that "they" are looking for him "all the way out in Lancaster".  The exchange ended with Defendant responding, "Ok" at approximately 9:12 a.m., followed by several unanswered text messages from his companion.  *See* Dkt. Nos. 29 and 32, Exhibits 4 and 5 to Oral Argument on Bail Appeal, held July 15 and 16, 2020.

While Defendant Renford was being taken to BPD headquarters after his arrest, he allegedly made more admissions that he set fire to City Hall.  Then, in a videotaped interview at BPD Headquarters, Defendant again waived his *Miranda* rights and stated, among other things, that he arrived in Niagara Square at around 9:00 p.m. on May 30, 2020; he was wearing black sweat pants, silver/white Nike Air Max's, and a Chanel face mask with red and gold on it that night; after unknown individuals near City Hall ignited a

---

[4] The Government alleges that Defendant may have changed his appearance by removing yellow or orange dye from his hair, because his hair was black in color when he was arrested.  Defendant argues that he has no chest tattoo and his hair is the same as before the alleged incident.

laundry basket and told him to throw it through a broken window into the building, he did so; and after the fire, he got rid of the black pants and face mask he was seen wearing on the news (Dkt. No. 18, p. 20).[5]

At the initial appearance on the criminal Complaint, a detention hearing was held and Magistrate Judge McCarthy issued an order of detention after finding that Defendant Renford had not rebutted the statutory presumptions of flight risk and danger (Dkt. Nos. 1, 4, 21).  Defendant later orally moved for reconsideration of detention and submitted an affidavit explaining changed circumstances and a proposed bail package (Dkt. Nos. 14, 22).  The Magistrate Judge granted the motion for release, setting conditions that included home incarceration subject to electronic monitoring (Dkt. Nos. 15, 23).  The Magistrate Judge noted that although the charges are serious and the evidence against the defendant is strong, given Defendant's family situation, the proposed bonds, the fact that Defendant planned to reside with his father, and other conditions imposed in the release order, "I'm reasonably assured that if released Mr. Renford would not pose a risk of flight or danger to the community" (Dkt. No. 23, pp. 20-21).

**DISCUSSION**

If a defendant is ordered released by a magistrate judge, the Government may, under 18 U.S.C. § 3145(a)(1), move for revocation of the release order before the district court.  Upon such a motion, the district court performs *de novo* review of the magistrate judge's release order.  *See United States v. Leon,* 766 F.2d 77, 80 (2d Cir.

---

[5] Neither the body-worn video nor video of the Headquarters interview were docketed below or offered during the revocation hearing.

1985) (finding that a district court "should not simply defer to the judgment of the [M]agistrate, but [should] reach its own independent conclusion").

When conducting *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence. *See e.g. United States v. Colombo*, 777 F.2d 96, 98 (2d Cir. 1985). The appeal of a magistrate judge's pretrial detention order to this Court is to be "determined promptly." 18 U.S.C. § 3145(b).

In this case, the Government objects to Defendant's pretrial release on the grounds that he poses a danger to the community and is a serious risk of flight, and that no condition or combination of available release conditions will reasonably assure the safety of the community and the appearance of the Defendant as required. The Government therefore has the burden to show by clear and convincing evidence that the danger posed by the Defendant cannot be alleviated by any combination of available conditions. *See United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir.1985). It also has the burden to show by a preponderance of the evidence that there exists a serious risk of flight and that no conditions will reasonably assure the Defendant's appearances in court and as otherwise required. *Id.*

In determining whether there are conditions of release that will reasonably assure the safety of the community and the Defendant's appearances as required, the Court must consider the factors in 18 U.S.C. § 3142(g):

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including –

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Under the Bail Reform Act, a judicial officer's finding that there is probable cause to believe that the defendant violated any of a specified group of statutes gives rise to a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(C). The charged offense of arson in violation of 18 U.S.C. § 844(i) is among them as an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed. *See* 18 U.S.C. § 3142(f)(1)(A). A grand jury indictment alone, such as the one returned here against Defendant, establishes probable cause and no independent finding of probable cause by the Court is necessary. *See United States v. Contreras*, 776 F.2d 51, 55 (2d Cir. 1985). It is undisputed that the rebuttable presumption applies in this case.

When the § 3142(e) rebuttable presumption in favor of detention arises, the Government retains the burden of persuasion if it is seeking detention.  In order to rebut the presumption, the defendant "must introduce some evidence contrary to the presumed fact[s]."  *United States v. Rodriguez*, 950 F. 2d 85, 88 (quotation omitted) (2d Cir. 1991).  "Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant."  *Id.* (quotation omitted). The § 3142(e) presumptions that no conditions of release are sufficient, if unrebutted, will alone sustain the Government's burdens of proof on danger and serious risk of flight.  *See id.; see also United States v. Parker*, 65 F. Supp. 3d 358, 364 (W.D.N.Y. 2014).

Because the Court must consider all of the § 3142(g) factors in evaluating whether to detain or release Defendant pretrial, the Court addresses each factor in turn:

**Nature and Circumstances of the Offense**

Livestream news video footage from the night of the arson of City Hall tendered by the Government depicts an individual, allegedly Defendant, wearing the distinctive Chanel face mask.  Defendant first yells, with an arm thrust overhead in excitement, "Black Lives Matter!," just a few feet from the camera.  Less than a minute later, he picks up a green laundry basket with flames in it, steps up on a waist-high two-level abutment and on to the frame of the already broken window, and tosses the flaming basket into City Hall.  The video footage also captures Defendant descending from the abutment, and shortly thereafter standing nearby in Niagara Square.

The Government has submitted to the Court both still images (in its motion papers) and news video footage and video surveillance (which the Court requested at oral argument on the appeal) from the evening of May 30, 2020 to support its allegations.  Proffered videos and still images purportedly show Defendant: (1) participating in a burglary and looting at a 7-11 store on the corner of Elmwood Avenue and Summer Avenue in Buffalo at approximately 10:10 p.m., which contradicts some of his answers to questions posed to him during the videotaped Headquarters interview; (2) posing for pictures and giving the middle finger in front of a bail bond van parked in Niagara Square that had apparently been set on fire; and (3) mounting the abutment at the base of City Hall, approaching the window and tossing the burning laundry basket into the window at approximately 11:25 p.m., and then raising one arm in celebration.  *See* Dkt. No. 18, pp. 12-16; Dkt. No. 25, pp. 3-6; Dkt. Nos. 29 and 32, Exhibits 1, 2, 3, and 6 to Oral Argument on Bail Appeal, held July 15 and 16, 2020.

The Government argues that this evidence weighs against Defendant's pretrial release because Defendant not only damaged City Hall but also put the safety of himself and others at risk.  Defendant disputes the amount of damage caused to the building and argues that his actions could not have caused widespread harm because he allegedly threw fire into an "empty building".  He points out that City Hall was closed due to the pandemic, and that the arson took place after-hours.  Defendant also urges the Court to view his alleged actions in the context of the pandemic and the nationwide protests against police brutality.

Despite Defendant's professed fervor for the legitimate protest, and even though Defendant appears to have targeted property, people close by and firefighters were put

at risk when he set City Hall on fire.  The Court appreciates that no one was injured but Defendant could have caused harm to other by-standers, police officers, and fire personnel.  The incident resulted in diversion of BPD and BFD resources during chaotic events after the night's curfew began.

Defendant suggests that he may have been intoxicated at the time of the arson. "'[D]efenses such as diminished mental capacity and voluntary intoxication are viable only for specific intent crimes, because such defenses directly negate the required intent element of those crimes.'"  *United States v. Ward*, 2019 U.S. Dist. LEXIS 202975, *22 (D. Conn. Nov. 22, 2019), quoting *United States v. Darby*, 37 F.3d 1059, 1064 (4th Cir. 1994).  The Court's preliminary research has located no case law addressing whether voluntary intoxication is a defense to a § 844(i) arson charge, but because the intent element of the § 844(i) offense may be satisfied by evidence of willful disregard of the likelihood that damage or injury would result from the defendant's acts, it may not be available as a matter of law.  *See e.g.*, Model Penal Code § 2.08(1) and (2).

Even assuming, for the sake of argument, that voluntary intoxication could serve to negate specific intent here, the intoxication would need to be severe enough that it interfered with the arsonist forming the requisite intent.  *See Charleston v. Woods*, 2018 U.S. Dist. LEXIS 3857, *32 (E.D. Mich. Jan. 9, 2018) ("federal courts have rejected ineffective assistance of counsel claims based on an attorney's failure to raise an intoxication defense on the ground that *the level of intoxication needed to negate specific intent is so high* that the defense is rarely successful.") (emphasis added) (collecting cases).  As depicted in the news video footage, Defendant's actions appear purposeful.  He yells at the camera, deliberately picks up the flaming laundry basket,

steps up on the large two-level abutment of City Hall, aims and succeeds in throwing the flaming basket through the broken window into the building.  He watches the flames inside the building briefly and thrusts an arm upward in celebration.  There is no staggering or even a misstep.

Defendant further suggests that he could not have formed the *mens rea* for the arson offense because he was acting "in the heat of passion" after being directed and encouraged to set the fire by others who were rabble-rousing after the curfew.  But the lack of a long period of deliberation does not mean there was a lack of intent.  Even though the duration of Defendant's planning may have been short or even nonexistent, that does not mean Defendant did not intend to cause damage to City Hall by lighting it on fire.  It does not mean that he did not act recklessly and without regard to the likelihood that damage would result from his actions.

As acknowledged by the Magistrate Judge, Defendant is charged with an unquestionably serious and dangerous offense, arson under 18 U.S.C. § 844(i), for which he faces a mandatory minimum sentence of five years and a maximum sentence of 20 years if convicted.  The Court finds that the "nature and circumstances of the offense" as contemplated by 18 U.S.C. § 3142(g)(1) weigh in favor of pretrial detention.

**Weight of the Evidence**

Magistrate Judge McCarthy noted the strength of the evidence against Defendant.  This factor is "generally consider[ed]" the "least important" of the § 3142(g) factors because the Bail Reform Act does not require or permit a pretrial determination of guilt or innocence; rather, this factor "may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the

community." *United States v. Jones*, 566 F. Supp. 2d 288, 292 (S.D.N.Y. July 17, 2008) (internal quotations and citations omitted).

The weight of the proffered evidence in this case is compelling. Defendant's videotaped admissions are well-corroborated by video of the arsonist in the act. Even disregarding the distinctive face mask, the perpetrator is plainly recognizable in the video. He is thin, shirtless, and is wearing his hair in a large "man bun".

The Government has further proffered that it has a statement from an individual who resides with Defendant, indicating the person recognized the Defendant on video of the arson of City Hall and that Defendant admitted to having committed the crime. In addition, shortly before his arrest, according to text messages the Government later obtained, Defendant discussed that he needed to change his appearance to evade the police. When police arrived at his residence on June 1st, he hid from them. These behaviors show a consciousness of guilt.

Defendant suggests that unknown agitators or anarchists provoked him and that he was a "perfect target" due to mental health and intoxication issues. But the credible evidence undermines Defendant's suggestions that he did not have the *mens rea* for this offense, *i.e.,* maliciously damaging or destroying, or attempting to damage or destroy, City Hall. To have acted with "malicious intent" means Defendant committed arson "with the intent to cause damage, *or that he did so recklessly* and without regard to the likelihood that damage would result". *McNaught v. United States*, 646 F. Supp. 2d 372, 380 (S.D.N.Y. May 13, 2009) (emphasis in original), quoting *Hon. Leonard B. Sand, et al., Modern Federal Jury Instructions*, 30-5. Defendant's conduct shows he was acting purposefully around the time he threw the flaming basket through the

13

window.  Even if the arson was someone else's idea, Defendant's actions show at a

minimum that he adopted an intent to set City Hall on fire.

Putting aside questions Defendant Renford has raised over the reliability and

admissibility of admissions he is said to have made, and the admissibility of the

distinctive face mask,[6] the weight of the evidence against him is overwhelming.

Defendant now denies that he was the person who threw the flaming laundry basket

into City Hall, and he remains an innocent man.  *See* 18 U.S.C. § 3142(j).  However, it

is well settled that when evidence of a defendant's guilt is solid, and when the potential

penalty is lengthy, as is true in this case, a defendant has more incentive to flee.  *See*

*United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007).  Although the strength-of-

the-evidence factor may not receive as much weight as the other § 3142(g) factors in

the overall analysis, it supports Defendant's pretrial detention.

## History and Characteristics of the Defendant

While some aspects of Defendant's history and characteristics weigh in favor of

pretrial release, on balance, this factor weighs strongly against release.  The Court does

acknowledge several circumstances in Defendant's favor.  He quickly confessed to

police.  He is the father of a two-month-old son, and at the detention hearing his counsel

expressed the Defendant's desire to "get back on track" for his son.  Defendant appears

to have had a difficult childhood.  He expressed remorse at his interview by the BPD

partly because his grandmother works in City Hall.  Defendant is a life-long resident of

---

[6] These questions were raised at the July 15, 2020 oral argument on this bail appeal.  Defendant noted
that another individual's DNA was found on the distinctive face mask and he also seemed to question
whether it was recovered as the result of a proper search.  Defendant questioned the reliability and
admissibility of the confessions as well.  Even assuming the plausibility of Defendant's suppression
arguments, "[s]ome courts have held that evidence which is being suppressed for purposes of trial may
nevertheless be considered in evaluating the 'weight of the evidence' factor under § 3142(g)."  *United
States v. Barner*, 743 F. Supp. 2d 225, 230 (W.D.N.Y. 2010).

Buffalo and he has no travel documents.  Defendant's father stated that he has a "great

relationship" with Defendant and he would play the role of disciplinarian if Defendant is

released on home incarceration.  Lastly, Defendant submitted letters to the Court from

two pastors in Buffalo relative this appeal, indicating at least some recent community

support (Dkts. 30, 31).

Defendant downplays his criminal history, stating it is "limited" and consists of

petty crimes.  However, Defendant's lengthy and quickly escalating criminal history (it

appears he is in Criminal History Category IV under the Sentencing Guidelines) shows

that he had not abided by conditions of court supervision and has committed additional

crimes while on release.

This is Defendant's eighth arrest in a two-year time frame, since May 2018.  He

has had multiple misdemeanor convictions (menacing in the second degree,[7] attempted

petit larceny, and unauthorized use of a vehicle), for which he received either probation

or jail time.  In relation to the menacing conviction, the Government proffers that just

before that arrest, Defendant posted a video and picture on his Facebook account

pointing a gun at the camera.  This information suggests that Defendant has violent

tendencies and a flagrant disregard for the law.  *See* Dkt. No. 18, pp. 22-23.

Defendant has one felony conviction, for fourth degree grand larceny, a Class E

felony.  He was sentenced by a state judge in August 2019 to five years of probation for

the grand larceny.  Only two weeks later the court issued a bench warrant for his arrest

due to a purported violation.  Defendant was re-sentenced on the violation to one year

---

[7] In July 2018, State authorities charged Defendant with robbery in the second degree, apparently
alleging he had used a "bb" gun to rob a female of her cell phone.  Defendant later pled guilty to second
degree menacing and received a time-served sentence.

in jail in November 2019 and, according to the Government, jail officials reported he was a problematic inmate. Around the same time in 2019, less than six months before the alleged City Hall arson, Defendant received an adjournment in contemplation of dismissal for criminal possession of stolen property and unauthorized use of a motor vehicle.

The U.S. Probation Pretrial Service Report also indicates Defendant has prior bench warrants, a re-arrest while under supervision, the prior probation revocation, and prior violent felony charges. Defendant has six orders of protection against him, three of which are active. Unfortunately, this is not the record of a person likely to honor the conditions of court supervision.

Other factors weighing against Defendant's release are his lack of stable employment, his past and present substance abuse, and his mental health conditions for which he has failed to follow through with treatment or medication. While, to his credit, the Defendant admitted the arson after he was arrested, he had made plans to change his appearance to avoid prosecution for the offense and hid from the police. He made some false statements to the police and U.S. Pretrial Services to try put himself in a better light. These circumstances suggest he may have confessed only after concluding in the face of the well-publicized and compelling video evidence against him that he had no practical alternative to admitting his guilt.

The Court finds that the details of Defendant's history and characteristics, especially his criminal record at only age 20, and his past problems adhering to conditions of court supervision, weigh in favor of pretrial detention.

16

**Danger to the Community**

Defendant argues that he was susceptible to manipulation because of his substance abuse and mental health issues, and concludes that the Court ought not to consider him a danger because he can be given treatment.[8]  He alleges family members believe there is a direct, causal link between his issues and his criminal history.  While it seems likely that Defendant's unmanaged mental health and substance abuse problems played a role in his criminal conduct, the Court is unable to conclude that treatment will prevent new offenses before the trial of this case.  Defendant received treatment and prescription medication in the past but discontinued treatment and self-medicated instead, committing serious crimes within just a two-year timespan. (To reiterate, Defendant appears to be in Criminal History Category IV at the age of 20. His criminal record includes eight arrests, numerous misdemeanor convictions, and a Class E felony conviction—all within the two-year timespan.  Moreover, there are multiple instances within those two years when he failed to abide by conditions of court supervision.)

Even if there was no long period of premeditation before the alleged arson and Defendant's actions were solely the result of others' influence or instigation, that does not necessarily make Defendant less dangerous.  If Defendant is as susceptible to suggestion and impulsive violence as he argues, he remains a risk of criminal activity or

---

[8] Defendant has submitted correspondence regarding potential treatment options.  *See* Dkt. Nos. 26 (letter from Horizon Village approving him for assessment, and assessment for possible long-term treatment), 30 (letter from one pastor, proposing that Defendant be registered with the Community Action Organization of WNY's Employment and Training Program, The Cold Spring Bible Chapel Adult Spiritual Mentoring Program "Men of Standards", and Spiritual Enrichment Study Classes), 31 (letter from another pastor, asking that Defendant be released to Back to Basics Outreach Ministries, Inc. to engage in two funded anti-violence programs).  In the continued bail appeal oral argument on July 16, 2020, the Court stated on the record its review of Docket Numbers 26 and 30.  The Court had not reviewed Docket Number 31 before the oral argument (it was filed that same day), but it has done so now.

violence while on release.  The Court finds that the danger Defendant poses is the sort of danger to the community that likely prompted Congress to enact the presumption that persons charged with this crime pose a risk of danger while on pretrial supervision that no combination of release conditions will reasonably mitigate.

**Weighing the Bail Reform Act Factors**

The Court must carefully consider whether available conditions of release will reasonably assure the safety of the community and Defendant's court appearances.  In light of all the circumstances, the Court specifically finds that Defendant has failed to overcome the statutory presumption "that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(C).

Magistrate Judge McCarthy released Defendant to home incarceration with electronic monitoring in his father's residence on the condition that Defendant's father and another family member's mother post partially secured bonds in the amount of $20,000 each, secured by $5,000 and $1,000 in cash, respectively.  The Magistrate Judge questioned Defendant's father and other potential surety about their employment situations, but little else.  While Defendant has ties to these potential sureties, his conduct over the last two years suggest they are not particularly strong ties.  In fact, during his U.S. Pretrial Services interview, Defendant reported he was not sure where his father lived.  The Court concludes that home incarceration and the partially secured bonds are inadequate and that no available set of conditions will reasonably assure community safety and Defendant's appearances in Court (*see e.g.* Dkt. Nos. 26-1, 27).

Electronic monitoring devices "can be circumvented" and "rendered inoperative." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993). Moreover, the Government has proffered that Defendant lied to law enforcement and the United States Probation Office about his circumstances. He allegedly stated (1) he had been arrested only twice, with one of those cases dismissed and the other receiving an adjournment in contemplation of dismissal; (2) there was only one order of protection against him, due to the instant offense; and (3) the only 7-11 he was in the night of the incident was on Auburn Avenue, for a "split second". The U.S. Probation Pretrial Service Report and 7-11 video surveillance tend to show the Defendant was untruthful and makes him appear untrustworthy.

Defendant Renford's criminal history gave him ample reason to know the serious personal consequences he risked by his actions on the night of May 30, 2020, including a substantial prison term. He flagrantly disregarded those consequences despite the high likelihood that he would be identified after setting City Hall on fire, given his relatively distinctive appearance, *i.e.*, thin, shirtless, a big "man bun," and the Chanel® face mask, within minutes after he faced a livestream news video camera and shouted into the camera with an arm thrust raised over head.

Unfortunately, the danger to the community posed by Defendant is not sufficiently mitigated by electronically monitored home incarceration with minimally secured bonds. Defendant may or may not be less dangerous than someone who would be more careful not to get caught, but the Court has evaluated the risk of danger based upon the evidence of Defendant's conduct; his criminal record that includes eight arrests, multiple misdemeanor convictions, multiple bench warrants, one felony

19

conviction, a re-arrest while on supervision, and prior probation revocation; and his other personal characteristics.

The serious risk of flight is likewise not mitigated by any proposed or available conditions of release. The evidence against Defendant is compelling, and he faces a 5-year mandatory term of imprisonment if convicted. He tried to evade police and spoke of changing his appearance to avoid prosecution, and now his incentive to flee is certainly even greater.

## CONCLUSION

The Court has carefully considered each of the § 3142(g) factors in this case. For the reasons stated above, the motion of the Government pursuant to 18 U.S.C. § 3145(a)(1) (Dkt. No. 18) to revoke the Magistrate Judge's pretrial release order of June 22, 2020 (Dkt. No. 15) is granted, and Defendant Renford is ordered detained pending trial. The Court finds by a standard of clear and convincing evidence that the electronic monitoring, financial, and other conditions imposed upon Defendant's pretrial release are inadequate to alleviate the danger to the community posed by Defendant. The Court also finds by a standard of preponderance of the evidence that the proposed conditions do not reasonably assure Defendant's appearances in court and as otherwise required. These findings are made particularly in light of Defendant's significant and recent criminal history, the nature and circumstances of the offense, the strength of the proffered evidence, and the lengthy mandatory term of imprisonment he faces if convicted. No other available conditions will adequately assure his appearances or the safety of the community.

The Court therefore orders that Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal.

The Court further orders that Defendant be afforded reasonable opportunity for private consultation with counsel.

Finally, the Court directs that on order of a Court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which Defendant is confined shall deliver Defendant to a United States Marshal for the purpose of his appearance in connection with any court proceeding.

This ruling is without prejudice to Defendant's right to the presumption of innocence, and to his right, pursuant to 18 U.S.C. § 3142(f), to seek reconsideration of his pretrial detention based upon changed circumstances.

**SO ORDERED.**


_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  July 28, 2020